**BOCHETTO & LENTZ, P.C.**
By:    George Bochetto, Esquire
          David P. Heim, Esquire
I.D. Nos. 27783, 84323
1524 Locust Street
Philadelphia, PA  19102
(215)735-3900
gbochetto@bochettoandlentz.com
dheim@bochettoandlentz.com        *Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DANIEL M. DiLELLA and FRANK GIORDANO<br><br>*Plaintiffs*,<br><br>vs.<br><br>RENEE BURCHARD, KIRSTI GARLOCK, ANNA LAYMON, KERI POTTS, JOHN and JANE DOE(S) 1-5.<br><br>*Defendants*. | NO. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiffs, Daniel M. DiLella and Frank Giordano (sometimes collectively, "Plaintiffs"), by and through undersigned counsel, Bochetto & Lentz, P.C., bring this action against Defendants identified in the caption above, and in support thereof aver as follows:

**INTRODUCTION**

1. In the Summer of 2026, this Nation will celebrate the 250th anniversary of the Nation's Founders signing the Declaration of Independence on July 4, 1776.

2. In 2016, ten years in advance, Congress created the U.S. Semiquincentennial Commission ("Commission") to organize and coordinate the Nation's 250-year anniversary celebrations around the Country and the World.

3. The Commission is comprised of numerous appointed members, who include U.S. Senators, Members of the U.S. House of Representatives, U.S. Ambassadors, and several distinguished private citizens from various parts of the Country with diverse backgrounds in academia, the arts, and business.

4. This case concerns a malicious effort by the Defendants to impugn and destroy the reputations of two leaders of the Commission, Plaintiffs, Daniel M. DiLella, who was appointed the Chairperson of the Commission by Former President Trump and then reappointed by President Biden, and Frank Giordano, who was hired as the Executive Director of the Commission.

5. The Defendants herein are four female former employees of the America 250 Foundation, a private, not-for-profit entity contracted by the Commission to assist in planning the Semiquincentennial.

6. Defendants filed a bogus lawsuit against Plaintiffs, falsely accusing them of "mismanagement" and "discrimination," claims which had zero merit, have since been dismissed against Plaintiffs, and were concocted by Defendants as part of an overall conspiracy to ruin the reputation of Plaintiffs and force the Commission to expel Plaintiffs from leadership.

7. That lawsuit was not filed for the purpose of litigating legitimate or valid legal claims against Plaintiffs, but rather was designed to abuse the legal system as a means to publicly libel, slander, and smear Plaintiffs by accusing Plaintiffs of mismanaging the Commission, wasting public funds, engaging in cronyism, violating the Commission's internal

rules and by-laws, breaching their fiduciary duties and unlawfully discriminating against Defendants based on gender, all of which is completely contradicted by the true facts.

8. After filing these false and malicious claims in Court, Defendants then intentionally repeated these same false and defamatory statements to the media, including *The Philadelphia Magazine*, to ensure their false litigation claims would reach members of the Philadelphia area business community, where both Plaintiffs' professional networks are primarily based.

9. Ultimately, Defendants' conspiracy was successful; after filing their bogus lawsuit and repeating the lawsuit's allegations to the media, the White House decided to replace DiLella as Chairperson, and Giordano was asked to step down as Executive Director of the Commission.

10. Plaintiffs are filing this case to set the record straight – they committed none of the nefarious acts of which Defendants falsely accused them – and to hold Defendants accountable for their outrageously frivolous and abusive lawsuit which have caused Plaintiffs enormous harm to their personal and professional reputations.

## PARTIES

11. Plaintiff, Daniel M. DiLella ("DiLella"), is an adult individual with residences in Florida and in Pennsylvania. DiLella can be served c/o Bochetto & Lentz, P.C., 1524 Locust Street, Philadelphia, Pennsylvania 19102.

12. Plaintiff, Frank Giordano ("Giordano"), is an adult individual residing in Moorestown, New Jersey. Giordano can be served c/o Bochetto & Lentz, P.C., 1524 Locust Street, Philadelphia, PA 19102.

13. Defendant, Renee Burchard ("Burchard"), is a resident of the Commonwealth of Virginia with a residential address at 6016 Pike Branch Dr., Alexandria, Virginia 22310-2225. She was, until she voluntarily quit, an employee of the America 250 Foundation.

14. Defendant, Kirsti Garlock ("Garlock"), is a resident of the Commonwealth of Virginia with a residential address at 6169 McLendon Ct, Alexandria, Virginia 22310-1616. She was, until she voluntarily quit, an employee of the American 250 Foundation.

15. Defendant, Anna Laymon ("Laymon"), is a resident of the State of Alabama with a residential address at 510 Bay Bluff W, Daphne, Alabama 36526-4060. She was, until she voluntarily quit, an employee of the American 250 Foundation.

16. Defendant, Keri Potts ("Potts"), is a resident of Arizona with a residential address at 10242 E. Saltillo Drive, Scottsdale, Arizona 85255-8611. She was, until she voluntarily quit, an employee of the American 250 Foundation.

17. Defendant, John and Jane Does, are yet unknown Defendants who conspired with Defendants and/or encouraged, enticed and procured the filing of the frivolous discrimination lawsuit filed against Plaintiffs.

## JURISDICTION AND VENUE

18. This Court has specific personal jurisdiction over Defendants because each of them had specific contacts with Pennsylvania related to the claims set forth herein, including their participation in the Commission and the America 250 Foundation, and they directed their tortious activity at Plaintiffs with the intent of harming both Plaintiffs in Pennsylvania, including giving interviews to *The Philadelphia Magazine*.

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that the Plaintiffs' citizenship are completely diverse from the Defendants' citizenship and the amount in controversy exceeds $75,000.

20. Venue is proper in this Judicial District in that part of Defendants' conduct giving rise to these claims occurred in this District, including interviews with *The Philadelphia Magazine*, wherein Defendants directed the false statements from their bogus lawsuit to Plaintiffs' friends, neighbors, family members and business associates in and around Philadelphia.

## FACTS COMMON TO ALL COUNTS

21. Plaintiffs have each achieved high levels of success in their professional careers and as leaders for diverse philanthropic efforts. Prior to the abusive lawsuit and tortious campaign waged by Defendants, Plaintiffs enjoyed superb reputations for their charitable work and as business leaders.

22. DiLella has been a stalwart of the real estate investment community for over four decades. He currently is the President and CEO of Equus Capital Partners, Ltd., a national real estate investment management company with many billions of dollars under management, including investments from the nation's most prominent public, corporate and union pension plans, university endowments, and foundations.

23. Before being appointed by the President of the United States as Chairperson of the Semiquincentennial Commission in 2016, DiLella served on numerous charitable and education executive boards, including serving as Trustee of the Cahill Trust, Board member for the Museum of the American Revolution, President of the Union League of Philadelphia, Board of Trustees of Villanova University, Chair of the Trustee's Committee of Villanova University, and Chair of the Board of Roman Catholic High School in Philadelphia, among others.

24. Likewise, Giordano is well-known for being a long-time advocate for charitable causes involving the public interest, particularly charities promoting the arts.

25. Giordano has been honored by appointments on the governing boards of numerous philanthropic organizations and committees, including as an appointee by the White House to the President's Advisory Committee on the Arts, serving on the Board of Trustees for the Coriell Institute for Medical Research, Rowan University, the Philadelphia Youth Orchestra-Institute, and as a past President of the Union League of Philadelphia.

26. Giordano has also operated a very successful, family-owned logistics and transportation business established some 70 years ago, and he is a respected member of the business community.

27. Because of their long and distinguished careers serving on charitable boards and committees, DiLella and Giordano were ideal choices for leadership positions on the Commission, and they considered their leadership roles as a once in a lifetime honor, where they each could use their vast experiences as business and philanthropic leaders to help provide a platform for celebrating the 250th Anniversary of the World's first modern Democracy.

28. Thus, when they received their appointments, DiLella and Giordano immediately committed substantial amounts of their time, energy, and resources toward achieving the Commission's goals, all before any funding was appropriated by Congress.

29. DiLella and Giordano began organizing and setting agendas for the Commission, hiring consultants and staff, finding office space, and spending hundreds of thousands of dollars from personal funds on start-up costs for the Commission.

30. In the early stages of the Commission, DiLella and Giordano also relied heavily on their professional networks to obtain much needed services from people and companies that would work *pro bono* (*i.e.*, without compensation) before funds were appropriated.

31. Following the establishment of the Commission, the U.S. Department of Interior/National Park Service requested public bids for non-profit entities to serve as the "Administrative Secretariat" of the Commission, which would serve as a private nonprofit partner of the Commission that would engage in fundraising, sponsorship, and planning efforts.

32. After a public bidding process, the American Battlefield Trust was selected as the Commission's Administrative Secretariat by the U.S. Department of Interior and the National Park Service.

33. Ultimately, in consultation with the Department of Interior and the National Park Service, the American Battlefield Trust created a separate nonprofit organization to perform the Administrative Secretariat's roles and activities for the Semiquincentennial, which led to the creation of the America 250 Foundation ("Foundation").

34. Upon its formation, the Foundation began hiring executive staff to perform the various duties of the Administrative Secretariat.

35. In this regard, Defendants were among those executive staff members hired by the Foundation.

36. In or about April 2020, Defendant Burchard was hired as the Foundation's Chief Administrative Officer and Chief of Staff.

37. In or about March 2021, Defendant Garlock was hired as a part-time consultant, and in April 2021 she was hired as the Chief Legal Officer of the Foundation.

38. In or about January 2021, Defendant Laymon was employed as the Vice President of Programs and Planning of the Foundation.

39. In or about March 2021, Defendant Potts was hired as the Vice President of the Communications and Public Relations of the Foundation.

40. Eventually, all Defendants voluntarily quit their executive positions with the Foundation; Laymon and Potts left in September 2021 and Burchard and Garlock left the Foundation in or about December 2021.

41. Months after they resigned, Defendants filed a bombastic, three-hundred paragraph Complaint containing eleven Counts, *falsely* accusing Plaintiffs of wasting public funds, violating the Commission's internal rules and by-laws, and unlawfully discriminating against Defendants based on their female gender.

42. That Complaint was filed on or about February 25, 2022 in the United States District Court for the District of Columbia and was captioned as *Burchard v. America 250 Foundation, et al.*, Civil Docket # 1:22-cv-00497-JMC ("Discrimination Lawsuit").

43. The Complaint originally named the Foundation, the American Battlefield Trust and the Commission as defendants, but later, on or about June 14, 2022, the Defendants filed an Amended Complaint, which named Dan DiLella and Frank Giordano as defendants in their individual capacity. The Amended Complaint contained over five hundred numbered paragraphs.

44. Although Defendants named DiLella and Giordano as parties in the Amended Complaint and obtained Summonses directed to DiLella and Giordano, Defendants failed to attempt service of the Amended Complaint on DiLella or Giordano.

45. Rather, after filing the Amended Complaint and failing to serve DiLella and Giordano for five months, Defendants voluntarily dismissed all claims against DiLella and Giordano with prejudice on or about November 21, 2022.

46. By filing the Complaint falsely accusing DiLella and Giordano of wrongful conduct, and by naming DiLella and Giordano as defendants in the Amended Complaint but

8

failing to serve them with the Amended Complaint before voluntarily dismissing all claims against them, Defendants exhibited an unmistakable intent to abuse the legal process in the Discrimination Lawsuit.

47. Defendants' actual intent was to use the bogus Discrimination Lawsuit as a reservoir of false and defamatory invective designed to impugn Plaintiffs' reputation and interfere with their relationship with the Commission and the Foundation.

48. Indeed, the allegations set forth in the Discrimination Lawsuit were proven demonstrably false by an independent investigation performed by Constangy Brooks Smith & Prophete, LLC ("Constangy"), a national law firm specializing in workplace discrimination law, and the certified public accountants at Strout Risius Ross LLC ("Strout"), a global firm specializing in corporate finance, accounting, financial disputes, claims and investigations.

49. That independent investigation involved reviewing all documents relevant to the Discrimination Lawsuit and requesting interviews of 28 individuals, including Foundation employees accused of wrong-doing, as well as those who would have witnessed alleged wrong-doing.  (Interviews were requested of the Defendants herein but they refused to participate or otherwise attempt to justify their allegations with actual evidence).

50. The investigation initially addressed the allegations in the Discrimination Lawsuit that Defendants were subject to a "hostile work environment based on gender" and that they suffered "retaliation for engaging in protected activity," concluding "[t]he information obtained through the investigation did not support a finding that any behavior on the part of Foundation employees was based on gender or any alleged protected activity of the Claimants."[1]

---

[1] A copy of the Executive Summary from Constangy's Investigation is attached as Exhibit "A."

51. Similarly, while Defendants complained that they received less pay because of their gender, Constangy concluded this allegation had no evidentiary basis:

> Regarding the Claimants' allegations of pay discrimination, we reviewed the compensation history of the four Claimants and potentially similarly-situated comparators. Based on this review, we conclude that any differences in compensation were based on legitimate factors that were not related to gender. In addition to the fact that none of the Claimants had true comparators because their positions were unique, we conclude that factors used to establish starting salaries were applied consistently and reasonably.

52. As to Laymon's specific allegation that her male replacement was paid "thirty thousand ($30,000) more" than her, Constangy concluded that allegation was false, stating "one Claimant's allegations that her male replacement was paid more than her was inaccurate; he was paid less than her."

53. The investigation further revealed the allegations that Defendants received "disparate treatment in work assignments" was likewise not supported. Constangy's investigation report concluded: "[t]he information obtained through the investigation did not support a finding that gender was a factor in how work was assigned."

54. Lastly, Defendants' allegations of financial impropriety, fraud and waste was shown to have no support by the Stout accounting firm which concluded that "the Foundation does not have systemic finance-related problems or a culture that leads to fraud, waste, or abuse of funds."

55. Because the Discrimination Lawsuit was dismissed against DiLella and Giordano before even being served, and because the independent investigation demonstrated the Lawsuit had no factual basis, the real motivations behind Defendants' lawsuit was to use it as a justification to spew defamatory invective against DiLella and Giordano in the media in order to

destroy their reputation and put public pressure on the Commission to terminate Plaintiffs from their leadership roles.

56. In this regard, starting in about March 2022 through June 2022, a series of strategically placed articles were published in the *Wall Street Journal,* the *Washington Post* and *Philadelphia Magazine*, in which the false allegations from the Discrimination Lawsuit were either directly quoted and/or Defendants themselves gave quotes to members of the media repeating their Lawsuit's false allegations, including, but not limited to the following:

- "'The foundation, the commission and an affiliated nonprofit – collectively called America250 – were sued on discrimination claims last month by four female former executives of the foundation who alleged they were effectively forced out by the 'boys club' running the project after objecting to what their lawsuit says was 'cronyism, self-dealing, mismanagement of funds, potentially unlawful contracting practices and wasteful spending." [*Wall Street Journal*, March 19, 2022]

- "But after working for the foundation for less than two years, Burchard resigned in December and sued in February, alleging the foundation had done nothing to further its mission, instead corruptly funneling federal funds to its leadership and favored contractors in a toxic, sexist environment.  The complaint alleged 'cronyism, self-dealing, mismanagement of funds, potentially unlawful contracting practices and wasteful spending.'  'This was run by a cabal,' Burchard said of the foundation. 'Everything had to go through the cabal.'"   [*Washington Post*, April 22, 2022]

- "Burchard and three other women quit the foundation when 'they could no longer participate in noncompliant, unlawful and/or fraudulent use of taxpayer funds, and could no longer endure a toxic and volatile work environment,' the suit said." [*Washington Post,* April 22, 2022]

- "In over 60 pages, their complaint alleges they were 'retaliated against, shunned, isolated, humiliated and undermined because of their activities as whistleblowers' and 'subjected to a hostile work environment because of their gender.'" [*Washington Post*, April 22, 2022]

- "The all-male leadership team also led, according to the lawsuit, to a workplace that was sexist and 'toxic.'" [*Philadelphia Magazine*, June 27, 2022]

- "Laymon had had six people directly reporting to her:  four women and two men.  It fielt like a confirmation of her decision when, after she left, the foundation

11

> promoted two men to replace her – and, according to a 2022 budget, paid one of them $25,000 more than she'd ever made in the role." [*Philadelphia Magazine,* June 27, 2022

- "According to Burchard, this was typical of how decisions were made – day-to-day employees came up with plans, only to see them disregarded by higher powers who happened to be a group of men, most of whom were friends and had ties to the Union League. 'It was kind of like the wizard behind the curtain,' she says. Laymon says the situation amounted to a 'big cabal of men, passing down their dictates.'" [*Philadelphia Magazine,* June 27, 2022]

(The articles from the *Wall Street Journal*, *Washington Post*, and *Philadelphia Magazine* are attached hereto as Exhibits "B," "C," and "D," respectively.)

57. The above quotes in the media were all false, misleading, and/or implied falsehoods, and they were all directed at Plaintiffs with the clear intent of harming their reputations and interfering with their roles on the Commission and with the America250 Foundation, which was the true intent behind Defendants' abusive and frivolous Discrimination Lawsuit.

58. In reality, DiLella and Giordano have not committed any of the wrongful acts of which Defendants accused them.

59. They both have worked tirelessly with undivided loyalty, always acting in the best interest of the Commission and the Foundation.

60. Multiple internal investigations and reviews of all DiLella's and Giordano's decisions and acts for the Commission and the Foundation have determined there was no evidence of the alleged wrongdoing.

61. Despite knowing the foregoing, Defendants filed their abusive and frivolous Discrimination Lawsuit and plastered the false allegations all over the media to ensure such false allegations would have the maximum damage to Plaintiffs.

62. Both DiLella and Giordano have suffered serious and long-lasting reputational harm because of Defendants' false and malicious Discrimination Lawsuit, which wrongly accused Plaintiffs of committing egregious wrongs in connection with performing fiduciary duties on a federally created Commission on a national and worldwide stage.

63. Both DiLella and Giordano have had to respond to inquiries from their family, friends, colleagues, and business associates about the Discrimination Lawsuit and the reporting concerning the Lawsuit.

64. Plaintiffs' reputations and positions with the Commission and the Foundation have also been severely damaged.

65. After Defendants filed their Discrimination Lawsuit and published the false allegations in the media from that Lawsuit, the White House decided to replace DiLella as Chairperson.

66. Likewise, Giordano has been replaced as Executive Director of the Commission, losing his salary from that position into the future.

67. Before filing these claims, Plaintiffs served Defendants with a demand to publicly retract their false and frivolous allegations from the Discrimination Lawsuit, but Defendants refused to do so.

## COUNT I: ABUSE OF PROCESS
### (ALL PLAINTIFFS v. ALL DEFENDANTS)

68. Plaintiffs incorporate by reference all other paragraphs of the complaint as though set forth fully herein.

69. By filing their bogus Discrimination Lawsuit, obtaining Summonses directed at DiLella and Giordano, Defendants issued legal process against Plaintiffs.

70. Defendants' Discrimination Lawsuit was not filed for a proper purpose, *to wit*, to litigate valid legal claims to obtain available relief against Plaintiffs.

71. Although Defendants named Plaintiffs as party-defendants and issued Summonses against Plaintiffs, Defendants took no efforts to serve Plaintiffs with the Amended Complaint.

72. Instead, five months after filing their Amended Complaint and having the Clerk issue Summonses to Plaintiffs, Defendants dismissed all claims against Plaintiffs with prejudice.

73. Defendants had no intent to litigate their claims against Plaintiffs, but rather had an ulterior motive and improper purpose in filing the bogus Discrimination Lawsuit against Plaintiffs.

74. Defendants' improper purpose was to use their bogus Discrimination Lawsuit as a basis to broadcast their false and frivolous claims to the media to put public pressure on the Commission and other public figures to oust Plaintiffs from their leadership roles with the Commission and to ruin Plaintiffs' personal and professional reputations.

75. Defendants were successful in that their abuse of the legal process had their intended impact.

76. As a direct and proximate result of Defendants' abuse of the legal process, DiLella and Giordano both lost their leadership roles with the Commission and their reputations were severely and permanently damaged in the process.

### COUNT II:  MALICIOUS PROSECUTION
### (ALL PLAINTIFFS v. ALL DEFENDANTS)

77. Plaintiffs incorporate by reference all other paragraphs of the Complaint as though set forth fully herein.

78. Defendants' Discrimination Lawsuit was frivolous and filed without probable cause.

79. Defendants' Discrimination Lawsuit was filed maliciously with the intent of injuring Plaintiffs and for an improper purpose.

80. Defendants' Discrimination Lawsuit was terminated in Plaintiffs' favor in that Defendants dismissed the Lawsuit with prejudice.

81. As a direct and proximate result of Defendants' frivolous Discrimination Lawsuit, Plaintiffs have suffered special damages, including the loss of their leadership positions on the Commission, severe and permanent reputational harm and emotional distress.

## COUNT III: CIVIL CONSPIRACY
### (ALL PLAINTIFFS v. ALL DEFENDANTS)

82. Plaintiffs incorporate by reference all other paragraphs of the Complaint as though set forth fully herein.

83. As set forth throughout this Complaint, Defendants agreed to act together to maliciously abuse the legal process and file a frivolous lawsuit in a concerted effort to interfere with Plaintiffs' relationships with the Commission and the Foundation.

84. As set forth throughout this Complaint, Defendants used their Discrimination Lawsuit and engaged in multiple acts intended to prevent Plaintiffs from continuing to lead the Commission and the Foundation.

85. As set forth throughout this Complaint, Defendants acted for the unlawful purpose of maliciously defaming Plaintiffs and unlawfully interfering with Plaintiffs' relationships with the Commission and the Foundation.

86. As set forth throughout this Complaint, Defendants each performed overt acts in pursuance of this scheme.

87. As a direct and proximate result of Defendants' conspiracy, Plaintiffs have been damaged by the actions of Defendants as set forth above.

**WHEREFORE**, Plaintiffs demand the following relief:

a. A judgment in favor of Plaintiffs and against Defendants, jointly and severally, for compensatory damages in excess of $75,000;

b. A judgment in favor of Plaintiffs and against Defendants, jointly and severally, for punitive damages;

c. Awarding Plaintiffs all costs of suit, plus pre and post judgment interest; and

d. Such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

**BOCHETTO & LENTZ, P.C.**

Date: November 20, 2023          BY:   __/s/ George Bochetto_____
                                         George Bochetto, Esquire
                                         David P. Heim, Esquire

*Attorneys for Plaintiffs*